# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **MARGARET SULLIVAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 11-CV-266-PJC** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Claimant, Margaret Sullivan ("Sullivan"), pursuant to 42 U.S.C. § 405(g), requests
judicial review of the decision of the Commissioner of the Social Security Administration
("Commissioner") denying her application for disability insurance benefits under the Social
Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the
parties have consented to proceed before a United States Magistrate Judge. Any appeal of this
order will be directly to the Tenth Circuit Court of Appeals. Sullivan appeals the decision of the
Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ
incorrectly determined that Sullivan was not disabled. For the reasons discussed below, the
Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background

Sullivan was 40 years old at the time of the hearing before the ALJ held in Tulsa,
Oklahoma, on December 14, 2009. (R. 26). When asked to list the reasons why she could not
work, she listed issues related to her memory, blood pressure, bipolar disorder, anxiety,
depression, and thyroid. (R. 27). The issues that most interfered with her ability to work were
her memory, her judgment, and her behavior toward other people, including anger. *Id.*

Sullivan testified that she worked for a cellular telephone company, selling cell phones, for eight years, but she took two or three leaves of absence each year for issues of depression, illness, or inability to be around people. (R. 28-31). She was fired, and this made her very upset to the point that she was afraid that she was going to kill the manager who fired her. (R. 31). She sought treatment at Laureate due to those homicidal feelings. *Id.* She testified that at the time of the hearing, she had weekly sessions with her counselor at Family & Children's Services, and she saw her psychiatrist approximately once every two months. *Id.* Sullivan believed she was a danger to herself, and she described previous suicide attempts and plans. (R. 36-37).

Sullivan testified that she had problems with her knees, even after arthroscopic surgery, due to degenerative arthritis. (R. 29). She had been in two car accidents in which her knees had been injured. (R. 29-30). She experienced pain and swelling every day, and she propped up her feet a couple of times a week. (R. 38). She had gained weight due to thyroid medication, and she was struggling with that weight because her knees made it difficult to exercise. (R. 39).

Sullivan had been diagnosed with sleep apnea, and she was using a CPAP machine. *Id.*

In 2004, Sullivan experienced chest pain, and she was evaluated. (R. 188-231). A letter from Cardiology of Tulsa dated September 30, 2004 stated that Sullivan was released to work full-time on October 11, 2004. (R. 224).

On December 14, 2004, Sullivan was seen by Jeffrey R. Morris, D.O. at Central States Orthopedics Specialists, Inc. for an initial evaluation of her knees. (R. 374). The evaluation notes that Sullivan had a previous right knee scope in October 2001 after a motor vehicle accident. *Id.* At the time of the evaluation, Sullivan had again been involved in an accident and had injured both knees, with the right more painful than the left. *Id.* Dr. Morris' impression after examination was internal derangement of the right knee, and he would make further

recommendations after an MRI examination.  *Id.*  The MRI done on December 22, 2004, showed

no abnormalities of the distal femur, but also showed: "Patellofemoral arthrosis with chondral

erosion to bone along the patella and associated bone edema as well as slight lateral patellar

subluxation and changes suggestive of abnormal patellofemoral tracking."  (R. 384).

Sullivan had arthroscopy surgery on her right knee on January 14, 2005.  (R. 236-37).  At

an office evaluation on January 25, 2005, Dr. Morris stated that Sullivan was doing well and that

she was walking with a mild limp and no assistive device.  (R. 373).  On February 22, 2005,

Sullivan was doing much better and was released from routine orthopedic care.  (R. 372).

On September 22, 2005, Sullivan returned to Dr. Morris for a reevaluation of her right

knee after an injury from a motor vehicle accident on August 29.  (R. 370-71).  X-rays were not

conclusive, and Dr. Morris ordered an MRI in order to rule out a torn meniscus and any fractures.

*Id.*  An MRI done the next day showed osteoarthritic change of the knee joint, particularly

affecting the patellofemoral joint.  (R. 398).  On September 27, 2005, Dr. Morris aspirated

Sullivan's right knee and injected Depo-Medrol and Marcaine.

Sullivan was voluntarily treated on an inpatient basis at Laureate Psychiatric Clinic and

Hospital ("Laureate") from October 25 to October 28, 2005.  (R. 282-309).  Sullivan reported

that she had been depressed since March 2005 after losing her job.  (R. 297).  She had suicidal

thoughts with plans, and she heard voices telling her that she should kill herself.  *Id.*  Her

diagnoses on Axis I[1] were major depressive disorder, recurrent, severe, without psychotic

features, and anxiety disorder, not otherwise specified.  (R. 299).  Her current Global Assessment

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation."  American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text
Revision 4th ed. 2000) (hereinafter "DSM IV").

3

of Functioning ("GAF")[2] was scored as 30, with a highest GAF in the past year of 70. *Id.* At discharge, she was considered improved, her Axis I diagnoses remained the same, and her GAF was assessed as 60. (R. 295-96).

Sullivan was seen for psychotherapy sessions at Laureate on an outpatient basis from December 2005 through September 2006. (R. 246-63). Sullivan saw a physician at Laureate on an outpatient basis for medication management on November 8, 2005, and she was diagnosed with bipolar disorder, with a GAF of 45-50. (R. 266). Her medications were changed to introduce Lamictal. *Id.* She was seen again on November 29, 2005, and she was considered much improved. (R. 264). She was taking Lamictal, Paxil, Ambien, and Xanax. *Id.* She had experienced some passing suicidal thoughts in the week before the appointment, and her GAF was asssessed as 55. *Id.* Sullivan was seen again for medication management at Laureate on December 21, 2005. (R. 269). She reported feeling tired, but hyper, and experiencing a couple of episodes of "raging" the week before the appointment. (R. 269).

Sullivan saw Dr. Morris for continuing right knee pain on March 7, 2006, and he recommended arthroscopy. (R. 368). Dr. Morris performed the procedure on March 31, 2006. (R. 233-35). At a follow-up appointment with Dr. Morris on April 18, 2006, Sullivan said that her knee felt much better. (R. 367). She returned on May 16, 2006 to have an evaluation of her

---

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

left knee, and following physical examination and x-rays, Dr. Morris' impression was "[c]hondromalacia patella left knee with patellar maltracking - patella tilt syndrome." (R. 365-66). Dr. Morris performed arthroscopy on Sullivan's left knee on June 16, 2006. (R. 240-42). At an office visit on June 29, 2006, Dr. Morris noted swelling of Sullivan's left knee and ankle, but stated that Sullivan could walk without crutches. (R. 364). On July 27, 2006, Sullivan had weakness, residual pain, and a very mild limp to her left leg, but Dr. Morris' opinion was that she was progressing quite well. (R. 363). He encouraged her to continue with exercises, and he believed her prognosis was good. *Id.*

At a medication management appointment at Laureate on April 27, 2006, Sullivan was being reactive to little things and experiencing some episodes of hopelessness and passive suicidal thoughts, but she did not want any changes to her medications. (R. 268). *Id.* On July 11, 2006, Sullivan was experiencing agitation and anger, with difficulty working, and her medications were adjusted. (R. 267).

At her August 3, 2006, medication management appointment at Laureate, Sullivan reported having "lost it" at work the day before and having difficulty calming down. (R. 270). She also had an episode of standing by the highway and considering suicide. *Id.* On August 29, 2006, Sullivan reported depression and manic symptoms such as racing thoughts. (R. 271). Her medications were adjusted, including introduction of lithium. *Id.* On September 7, 2006, Sullivan reported that her mood was better, but her memory was poor. (R. 272). On September 26, 2006, Sullivan reported that she had been fired, and she was cleaning houses. (R. 274). She reported that she had greatly reduced stress, and she was considered to be much improved. *Id.*

At a medication management appointment at Laureate on October 27, 2006, Sullivan reported that she was discontinuing her insurance, and she would need to be a "cash pay" patient.

(R. 273). She had run out of lithium, and she noted that she had felt more irritable. *Id.* The physician made changes to make Sullivan's medications more affordable. *Id.* On December 28, 2006, Sullivan felt she was doing well, although she got upset and cried at times. (R. 276).

Sullivan presented to the emergency room at St. John Owasso on December 30, 2006 with left knee and elbow pain and headache after slipping and falling on wet pavement the day before. (R. 328-41). She was diagnosed with brain injury with concussion and contusion of the knee and elbow. (R. 330-31). She was given medication and discharged. (R. 331).

At a medication management appointment at Laureate on January 24, 2007, Sullivan had symptoms of paranoia, together with seeing and hearing people outside her window who weren't there. (R. 275). The physician added psychosis not otherwise specified to Sullivan's Axis I diagnoses. *Id.* On February 20, 2007, Sullivan reported her mood was up and down, and she had experienced episodes during which she said mean things to her family members that she later regretted. (R. 277). She also had an episode in which she contemplated suicide with a loaded gun, but she denied any thoughts of hurting herself at the time of the appointment. *Id.* She was diagnosed with bipolar disorder, unspecified psychosis, and borderline personality disorder. *Id.* On February 26, 2007, Sullivan called the office of her physician at Laureate, saying she "couldn't go on this way," and saying goodbye. (R. 278). The physician was able to calm Sullivan down, and crisis intervention resources were deployed to assist Sullivan. *Id.*

Sullivan presented to the emergency room at St. John Owasso on June 27, 2007 with a chief complaint of left arm pain radiating to her neck, as well as complaints of headaches, dizziness, and nausea. (R. 342-59). Sullivan was given medication and discharged. (R. 348). She returned on June 29, 2007 by ambulance after twisting her ankle coming down the steps of her trailer. (R. 312-27). She was diagnosed with ankle injury and foot strain, and she was given

medication and discharged.  (R. 315).

Records from Family & Children's Services ("F&CS") show that a treatment plan was prepared dated November 16, 2007.  (R. 464-72).  The document stated an Axis I diagnosis of major depression disorder, recurring, moderate, and a GAF of 51.  (R. 471-72).  Sullivan saw Terri Stonehocker, M.D. for pharmacological management on January 8, 2008, and her lithium was increased and her other medications were continued.  (R. 473).  On February 5, 2008, Dr. Stonehocker added back in Paxil when Sullivan complained that she had been without Paxil, causing suicidal ideation.  (R. 474).

Sullivan was treated at Utica Park Clinic Owasso by Yancy Galutia, D.O. in 2008 and 2009 for miscellaneous medical conditions not directly related to this appeal, such as elevated blood sugar, hypertension, thyroid issues, abdominal pain, diarrhea, and vomiting.  (R. 481-521).

Sullivan saw a provider at F&CS on April 1, 2008, and she reported that, although she had been tense and in disputes with her ex-husband, she thought her medications were good and should not be changed.  (R. 534).  The provider noted that Sullivan's attention and concentration were adequate and her judgment and insight were average.  *Id.*  Her diagnosis was stated as major depressive disorder.  *Id.*  Sullivan saw Jeffrey Cates, D.O. on July 22, 2008, reporting that her sleep was poor, her mood was okay, and her anxiety and panic feelings were slightly increased. (R. 535).  The diagnosis was bipolar I disorder, most recent episode mixed, severe, without psychotic features, and her medications were continued unchanged.  *Id.*

Sullivan saw a provider at F&CS on January 13, 2009, and she reported that an increase in her lithium level had "really helped."  (R. 536).  The diagnosis was stated as bipolar disorder. *Id.*  On April 23, 2009, this provider appears to have included a note that she did not believe that Sullivan was disabled.  (R. 537).  Sullivan reported irritability, and the diagnosis was continued

as bipolar disorder. *Id.* Her medications were adjusted. *Id.* On July 14, 2009, Sullivan reported that an increase in lithium had allowed her to relax and not overreact. (R. 538). Her diagnosis was continued as bipolar disorder, and her medications were adjusted. *Id.* Sullivan saw Elka Serrano, M.D. on October 13, 2009, and she was stressed due to sewage problems at her house. (R. 539). The diagnosis continued as bipolar disorder, and her medications were adjusted. *Id.* Sullivan saw a provider on October 20, 2009, and complained of poor sleep and racing thoughts. (R. 540). She had been admitted to the Saint Francis Hospital cardiac unit for anxiety, and she reported breathing problems. *Id.* Her diagnosis remained bipolar disorder, and her medications were adjusted. *Id.* Also on October 20, 2009, an F&CS treatment plan was prepared, reflecting that Sullivan's Axis I diagnosis was bipolar I disorder, most recent episode mixed, severe, without psychotic features, and her GAF was 51. (R. 524-33). On December 1, 2009, Sullivan told her F&CS provider that she had been sleeping well, but had some daytime sleepiness. (R. 541). She was happy with her medications overall. *Id.* Her diagnosis was bipolar I disorder, most recent episode depressed, mild. *Id.*

Sullivan saw Dr. Galutia on February 12, 2010 with knee pain, and she was referred to an orthopedic specialist. (R. 546-48). On March 29, 2010, Sullivan was concerned about elevated blood pressure, headache, and neck and shoulder pain. (R. 549-51). Dr. Galutia increased her medications for blood pressure, prescribed Tylenol #3 for headache, and recommended rest, ice, and ibuprofen for thoracic sprain. (R. 551). Sullivan saw Dr. Galutia for other issues not related to her disability claim in 2010. (R. 552-60).

Sullivan saw Jon E. Orjala, D.O. on December 16, 2010 for what was described as a follow-up visit for right knee pain. (R. 571-72). Dr. Orjala's assessments were posterior horn medial meniscus tear right knee, patellar chondromalacia right knee, and knee pain. (R. 572).

He said that Sullivan should avoid squatting, twisting, climbing, kneeling, and doing "impact" activities. *Id.* Sullivan wanted to undergo knee arthroscopy, which was done by Dr. Orjala on December 27, 2010. (R. 564-65, 572). At a follow-up appointment on January 11, 2011, Sullivan was experiencing stiffness and effusions, and she described her pain as mild. (R. 566-67).

Sullivan was seen by agency examining consultant Clifford N. Alprin, M.D. on October 29, 2007, and her chief complaint was degenerative arthritis in both knees. (R. 416-22). On examination, Dr. Alprin noted that Sullivan's gait was stable and at an appropriate speed without use of assistive devices, and Sullivan moved about the examination room easily. (R. 417). Straight leg raising was negative, and toe and heel walking was normal. *Id.* Dr. Alprin found that Sullivan's knee flexion range of motion was limited. (R. 418). His assessments were degenerative joint disease in knee, carpal tunnel syndrome, bipolar disorder, and depression. (R. 417).

Agency nonexamining consultant Thurma Fiegel, M.D. completed a Physical Residual Functional Capacity Assessment form on January 15, 2008. (R. 448-55). For exertional limitations, Dr. Fiegel found that Sullivan had the physical capacity to perform light work. (R. 449). In the area for narrative comments, Dr. Fiegel noted complaints of carpal tunnel syndrome and degenerative arthritis in both knees. *Id.* She noted that Sullivan had not had surgery for the carpal tunnel syndrome, but had multiple surgeries on her right knee and one on her left. *Id.* Dr. Fiegel noted those portions of Dr. Alprin's examination that found a limitation of range of motion of the knees, but normal gait, heel and toe walking, and negative straight leg raising. *Id.* She noted that gross and fine manipulation were intact. *Id.* For postural limitations, Dr. Fiegel found that Sullivan should only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R.

450).  She found no other limitations.  (R. 451-55).

Agency examining consultant David E. Hansen, Ph.D. conducted a brief psychological evaluation of Sullivan on November 29, 2007.  (R. 424-27).  Sullivan scored 28 out of 30 on the Folstein Mini Mental Status Evaluation.  (R. 426).  Her gross mental status functioning was within normal limits.  *Id.*  Dr. Hansen assessed Sullivan with probable borderline personality disorder, and he thought this was more likely than bipolar disorder due to the absence of a description of manic symptoms by Sullivan.  *Id.*  He agreed, however, that she had difficulty stabilizing her mood, and she would experience difficulty working in the majority of competitive environments.  *Id.*  He wrote that Sullivan's major difficulty would be an inability to tolerate stress without exacerbation of her volatility of mood and her depression.  (R. 426-27).  His diagnosis on Axis I was depression, not otherwise specified, and his diagnosis on Axis II was borderline personality disorder.  (R. 427).

A nonexamining agency consultant completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form on January 11, 2008.  (R. 428-47).  On the Psychiatric Review Technique form, the consultant noted for Listing 12.04 that Sullivan suffered an affective disorder.  (R. 432).  For Listing 12.06, he assessed an anxiety-related disorder.  (R. 434).  For Listing 12.08, the consultant noted borderline personality disorder.  (R. 436).  For the "Paragraph B Criteria,"[3] the consultant found that Sullivan had moderate

---

[3]There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

restriction of her activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with insufficient evidence regarding episodes of decompensation. (R. 439). In the "Consultant's Notes" portion of the form, the consultant noted Sullivan's history of depression and anxiety, including her hospital stay at Laureate. (R. 441). The consultant briefly summarized Dr. Hansen's consultative report and concluded that Sullivan "does not respond well to stress and she is very emotional and would have some problems working on account of those difficulties, but should be able to perform unskilled work activity." *Id.*

On the Mental Residual Functional Capacity Assessment form, the consultant noted moderate limitations in three functional areas: 1) Sullivan's ability to maintain attention and concentration for extended periods; 2) her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and 3) her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 444-45). The consultant found no other significant limitations. *Id.* The consultant repeated the narrative statement included in the Psychiatric Review Technique form. (R. 446).

## Procedural History

Sullivan filed an application on October 2, 2007, seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 95-102). Sullivan alleged onset of disability as September 27, 2006. (R. 95). The application was denied initially and on reconsideration. (R. 48-52, 57-59). A hearing before ALJ John Volz was held December 14, 2009, in Tulsa, Oklahoma. (R. 23-45). By decision dated January 19, 2010, the ALJ found that Sullivan was not disabled from her alleged date of onset of disability through his decision. (R. 11-18). On March

17, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Sullivan met insured status requirements through December 31, 2011. (R. 13). At Step One, the ALJ found that Sullivan had not engaged in any substantial gainful activity since her alleged onset date of September 1, 2006. *Id.* At Step Two, the ALJ found that Sullivan had severe impairments of borderline personality disorder, depression, status post knee surgery, and carpal tunnel syndrome. *Id.* At Step Three, the ALJ found that Sullivan's impairments did not meet a Listing. *Id.*

The ALJ determined that Sullivan had the RFC to perform sedentary work limited to only simple tasks under routine supervision and no contact with the public on a continuous basis. (R. 14). At Step Four, the ALJ found that Sullivan was unable to perform any past relevant work. (R. 16). At Step Five, the ALJ found that there were significant numbers of jobs in the national economy that Sullivan could perform, taking into account her age, education, work experience,

and RFC. (R. 16-17). Therefore, the ALJ found that Sullivan was not disabled from September 1, 2006 through the date of his decision. (R. 18).

**Review**

Sullivan asserts that the ALJ failed to properly consider the opinion evidence and failed to make a proper credibility assessment. Regarding the issues raised by Sullivan, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Opinion Evidence**

Sullivan's first argument is that the ALJ impermissibly adopted a portion of Dr. Hansen's report and rejected a portion without adequate explanation for the difference in his reception of Dr. Hansen's evidence, citing *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007). The claimant in *Haga* had numerous physical and mental impairments, and the ALJ had included non-exertional restrictions in his RFC determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact with the public," and "no requirement for making change." *Id.* at 1207. A consulting examiner had filled out an RFC form indicating that the claimant was moderately impaired in seven functional categories. *Id.* The claimant argued that the ALJ had implicitly rejected the consulting examiner's opinion by failing to include any accommodations in his RFC determination that addressed the examiner's assessment that the claimant had moderate difficulty in her ability to deal appropriately with supervisors and coworkers and to respond appropriately to workplace pressures and changes. The ALJ had given no explanation relating to why he did not address some of the findings of moderate restrictions while including others, and the Tenth Circuit agreed that this omission required reversal so that the ALJ could explain the evidentiary support for his RFC determination. *Id*. at 1207-08.

The undersigned finds that *Haga* does not apply to the ALJ's decision and his discussion of Dr. Hansen's report. The ALJ first stated that the opinions of the nonexamining consultants supported his RFC determination. (R. 16). Evidence given by nonexamining consultants can constitute substantial evidence supporting the ALJ's decision. *See Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished). The ALJ then stated that he gave "significant weight" to that portion of Dr. Hansen's report noting that Sullivan's gross mental functioning was within normal limits. (R. 16). He followed that with a statement that "[l]ess weight is given to Dr. Hansen's opinion that [Sullivan] would have difficulty working within a majority of competitive environments." *Id.* The ALJ concluded that Sullivan would have a "diverse field" of employment choices. *Id.*

The ALJ's statements here are not akin to the ALJ's failure, in *Haga*, to explain why he did not address specific functional limitations that the consultant found in his RFC determination. While the ALJ labeled Dr. Hansen's statement regarding Sullivan's difficulty working in competitive environments as an "opinion," it was not true opinion evidence. The Tenth Circuit in *Cowan* explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan*, 552 F.3d at 1188-89. In *Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished), the Tenth Circuit explained that the ALJ did not have to discuss in depth generalized statements made by a treating physician that the claimant's level of function in employment would be "minimal" due to physical factors and emotional stress involved in "standard employment." The court in *Martinez* said that these statements by the physician were not inconsistent with the ALJ's RFC determination that the claimant could do sedentary work. *Id.*

Here, the ALJ considered Dr. Hansen's general statement regarding the difficulty Sullivan would have working, and he summarized Dr. Hansen's report in some depth. (R. 15-16). Dr. Hansen's report, including the statements at the core of Sullivan's complaint, was also considered by the nonexamining agency consultant, who used Dr. Hansen's report to conclude that Sullivan had moderate limitations in three functional areas. (R. 444-46). Using all of that evidence, the ALJ concluded that Sullivan could perform sedentary work if she was limited to simple tasks under routine supervision with no contact with the public on a continuous basis. (R. 14). As was true in *Martinez*, there was no error by the ALJ in this regard.

In Sullivan's Reply Brief, she expanded her argument to include the language of Dr. Hansen's report that he had informed Sullivan about "the need to locate work within a highly structured and supportive setting if possible," and that Sullivan's "primary challenge to employability would appear to be her inability to tolerate stress" due to exacerbation of her symptoms. Plaintiff's Reply Brief, Dkt. #20. In her Reply Brief, Sullivan said that these statements constituted opinion evidence that addressed Sullivan's functional abilities and that therefore the ALJ was required to discuss these statements and to weigh them. The Court disagrees that these additional statements changes the analysis above pursuant to *Martinez*. The first statement, that Dr. Hansen told Sullivan to seek employment in a structured and supportive environment "if possible," was weakened by his use of "if possible," it was advice to Sullivan rather than a statement of her abilities, and it was a generalized statement that was not inconsistent with the ALJ's RFC determination. The second statement regarding inability to tolerate stress being a "challenge" to Sullivan's employment was weakened by being written as a "challenge" rather than as a "barrier," and it, too, was a generalized statement that was not inconsistent with the ALJ's RFC determination.

Sullivan also states that the ALJ erred by equating Dr. Hansen's statement that Sullivan's gross mental functioning was normal with emotional stability. Plaintiff's Opening Brief, Dkt. #17, pp. 4-5. Sullivan objects to this as speculation on the ALJ's part. *Id.* The undersigned has reviewed carefully both Dr. Hansen's report and the ALJ's decision and can see no basis for this portion of Sullivan's argument. The ALJ obviously acknowledged that Sullivan had significant emotional issues, and he therefore limited her to simple tasks under routine supervision with no contact with the public on a continuous basis. There was no error on the part of the ALJ in this regard.

Finally, Sullivan argues that the functional limitations found by the nonexamining consultant in the Mental Residual Functional Capacity Assessment were not included in the ALJ's RFC determination and that there was no explanation of this omission. In *Atkinson v. Astrue*, 389 Fed. Appx. 804, 807-08 (10th Cir. 2010) (unpublished), the claimant argued that the ALJ's RFC determination was flawed because he had failed to mention all of the limitations found by the nonexamining consultant, including a moderate limitation in his ability to maintain attention and concentration for extended periods and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. The court said that the argument failed because the claimant had not raised it in the district court, but the court also said that it would have failed in any case because the ALJ accepted the consultant's "ultimate opinion that all of [the claimant's] limitations would not preclude non-complex work." *Id.* at 807. *See also Sayles v. Astrue,* 275 Fed. Appx. 790, 793-94 (10th Cir. 2008) (unpublished) (limitations in ability to perform activities within a schedule, to attend regularly, and to be punctual, and ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms at a moderate level did not preclude employment).

*Atkinson* is remarkably similar to the present case, and the undersigned finds that the ALJ's RFC determination was adequate for the same reasons given by the Tenth Circuit. The ultimate conclusion of the consultant here was that Sullivan "should be able to perform unskilled work activity." (R. 446). The ALJ's RFC required that Sullivan would be limited to simple tasks with no continuous contact with the public, and the ALJ cited the consultant's opinion as supporting his RFC determination. The undersigned finds that the ALJ's RFC determination was in accord with the ultimate conclusion of the nonexamining consultant, and therefore there is no reversible error here.

In her reply brief, Sullivan makes the point that the consultant actually used the word "unskilled," whereas the ALJ used the word "simple" in his RFC. Plaintiff's Reply Brief, Dkt. #20, p. 2. The Tenth Circuit has affirmed several cases in which the court quoted a Social Security Administration regulation stating that an unskilled job is "work which needs little or no judgment to do simple duties." *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 825 (10th Cir. 2011) (unpublished), quoting 20 C.F.R. § 404.1568(a); *Wendelin v. Astrue*, 366 Fed. Appx. 899, 904 (10th Cir. 2010) (unpublished) (same); *Heinritz v. Barnhart*, 191 Fed. Appx. 718, 722 (10th Cir. 2006) (unpublished) (same); *but see Chapo v. Astrue*, __ F.3d ___, 2012 WL 2384354 *4 n.3 (10th Cir.) ("unskilled" addresses only the issue of skill transfer and not impairment of mental functions). Here, the ALJ used the word "simple," and the undersigned finds that it was adequate to express in his RFC what the nonexamining consultant had described as "unskilled." For these reasons, there was no reversible error in the ALJ's use of the word "simple" in his RFC determination.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

Sullivan's entire argument is that the ALJ did not give any reasons for his credibility assessment beyond the introductory statement that he found that Sullivan's impairments could reasonably be expected to cause the alleged symptoms, but that Sullivan's statements were not credible to the extent they were inconsistent with his RFC determination. In fact, the ALJ gave supported reasons for his credibility assessment, all of which related to the consultative examination of Sullivan by Dr. Alprin. (R. 16). First, the ALJ noted that Sullivan told Dr. Alprin that she could not work due to limitations in sitting and in using her hands, but she also said that she could drive from Tulsa to Collinsville and back and could stand for about three hours. *Id.* The ALJ obviously found these two sets of statements to be contradictory. Second, the ALJ gave a series of findings from Dr. Alprin's examination that he believed were inconsistent with Sullivan's claims related to limitations of her physical abilities. He noted that Dr. Alprin found that Sullivan moved all of her extremities well, she was able to manipulate small objects without difficulty, her grip strength was good, and she had full range of motion in her joints. *Id.* Thus, the ALJ gave specific reasons for his finding that Sullivan was less than

fully credible, and those reasons were linked to substantial evidence.

There is one sentence of Sullivan's brief that might be an attempt to argue that the ALJ was required to include reasons for his credibility assessment that related to her mental impairments. Plaintiff's Opening Brief, Dkt. #17, p. 6. To the extent that Sullivan is attempting to make this argument, her one sentence that mentioned "mental functioning" in connection with the ALJ's credibility assessment did not sufficiently develop this argument for meaningful analysis and decision by this Court, and this argument is therefore waived. *See Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009) ("perfunctory" argument at district court level deprived that court of the opportunity to analyze and rule on that issue). Moreover, the ALJ's credibility assessment can be limited to one impairment without any discussion of other alleged impairments. In a recent case, the claimant argued that in assessing credibility the ALJ should have taken into account evidence of her injuries such as a broken foot and strained neck. *Zaricor-Ritchie*, 452 Fed. Appx. at 824. The court found that evidence of these injuries "lends no support to the credibility of her testimony regarding the severity" of other impairments. *Id.* As in *Zaricor-Ritchie*, the ALJ here did not have to base his finding that Sullivan's mental impairments were not totally credible on specific reasons and evidence directly related to those impairments, but he could rely on reasons related to her physical impairments. The ALJ's credibility assessment was supported by substantial evidence and met legal requirements.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 20th day of July 2012.

Paul J. Cleary
United States Magistrate Judge